IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| JOE T. WILLIAMS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 3:08-cv-0164 |
| ) | Judge Trauger |
| THE CITY OF FRANKLIN, TENNESSEE, ) | |
| JAMES R. JOHNSON, ) | |
| RANDY WETMORE, ) | |
| SHIRLEY HARMON, ) | |
| and MARY DODSON RANDOLPH, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM

Pending before the court is the Motion of Defendant Mary Dodson Randolph to Dismiss and/or for Summary Judgment on the Grounds of Qualified Immunity and for Failure to State a Claim (Docket No. 31), to which the plaintiff has responded (Docket No. 35), and defendant Randolph has replied (Docket No. 41). For the reasons discussed herein, defendant Randolph's motion will be granted in part and denied in part.

## BACKGROUND

The plaintiff in this matter was employed as the Director of Solid Waste for the City of Franklin, Tennessee (hereinafter "the City") from 1998 until December 12, 2007.[1] Defendant

---

[1] Unless otherwise noted, the facts are drawn from the Amended Complaint (Docket No. 16). For the purpose of a motion to dismiss, "[t]he complaint must be construed in the light most favorable to plaintiff, and its well-pleaded facts must be accepted as true." *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987).

1

Randolph served as an alderman on the Board of Mayor and Aldermen that governs the City from 2005 until her resignation on November 14, 2007.[2]

In the summer of 2007, the plaintiff complained to police officials about anonymous, threatening text messages that he and his family had received. Included among the anonymous messages that the plaintiff and his family received were the following:

> "(white trash) that fucking bitch has blood all over her bitch self. u aint no hero. aint got no fucking nuts. aint no friend. aint a man. its ur fault not hers." (July 2, 2007)
>
> "made promise to trader I not u but I hurt joew. I hurt him with power people. went to other alderlady house couldn't get thru. I go back now to aldrandolph" (July 3, 2007)

(Docket No. 1 Ex. A.)

Eventually, it was discovered that these anonymous messages were sent by defendant Randolph. Thereafter, on August 8, 2007, the City filed an ouster suit against defendant Randolph alleging that defendant Randolph had stalked and harassed a number of city residents. The plaintiff cooperated in the ouster proceeding. On September 11, 2007, defendant Randolph tendered her resignation from the Board of Mayor and Aldermen, effective November 14, 2007. In the interim between the initiation of the ouster proceeding and the effective date of her resignation, however, defendant Randolph continued to send the plaintiff intimidating text messages, and the messages began to include threats on the plaintiff's employment with the City. The text messages included the following:

---

[2]Other defendants in this case include the City itself; James R. Johnson, City Administrator; Randy Wetmore, Deputy City Administrator; and Shirley Harmon, Director of Human Resources for the City.

> "time almost up. hear u got money now. I b in touch tues or wed 4 u 2 give me mine. who alderman I get 2 fire u next? . . ." (August 10, 2007)
>
> "I getting my goddamn money. not waiting. I turn u into today u get fired. I c u daughter @ game 2nite. time u learn how 2 payback. . . ." (September 7, 2007)
>
> "leave burned up truck in service osha violation. u been turned in. give me my & it cheaper then when u get fired. u aint gone find work noplace then. cmon mofo." (September 29, 2007)
>
> "get u balls back from u wife & use em. did she lose em to? got whitmore [*sic*] watching u. he get u. u aint no a thing. u bess find them balls boy or it b 2 late." (September 29, 2007)
>
> "u b fired. I get liens against all u $ while I in town. c u til I do. 4 2 weeks I b here in town" (October 12, 2007)

(Docket No. 1 Ex. B.)

In addition to these text messages, the plaintiff alleges that, prior to the effective date of her resignation, defendant Randolph made complaints to city officials about the plaintiff's alleged misuse of his city-issued IBM computer. In late October 2007, defendant Wetmore asked for and obtained this computer from the plaintiff in response to defendant Randolph's complaints. Defendant Wetmore claimed to have found "cookies" on the computer from five pornographic websites on the computer. Although the plaintiff denied that he had accessed any pornographic websites, he was suspended for five days for misuse of the computer and, he alleges, this false information was disseminated to the media and the public at large.

The plaintiff appealed his suspension to defendant Johnson, and a hearing was held on November 20, 2007. At that hearing, defendant Johnson concluded that defendant Randolph's initiation of the investigation of the plaintiff's IBM computer was retaliatory and reduced the plaintiff's suspension from five days to three days. Subsequently, the city police department

3

reviewed the IBM computer and found that it contained no illicit images. On December 4, 2007, the deputy police chief issued a memorandum to defendant Wetmore to this effect.

Meanwhile, on November 20, 2007, the same day as the hearing on the plaintiff's appeal, defendant Wetmore took possession of a city-issued Compaq computer that was in the plaintiff's office. Defendant Wetmore had the police department review the contents of the Compaq computer, and the police department found that forty-one images, a majority of which were pornographic, had been imprinted on the computer's hard drive in a temporary internet file in a span of thirteen seconds. On November 28, 2007, defendant Wetmore notified the plaintiff that he was suspended without pay because he failed to disclose the existence of the Compaq computer and because that computer contained "multiple pornographic images accessed over an extended period of time."

A hearing regarding the plaintiff's suspension was scheduled for December 10, 2007. In preparation for that hearing, the plaintiff requested access to the Compaq computer so that he could have the computer reviewed by a computer forensic expert. Defendant Harmon denied this request. Additionally, prior to the hearing, defendant Harmon made available to the media a packet of the evidence against the plaintiff.[3] Prior to the hearing, the plaintiff had a conversation with defendant Johnson in which defendant Johnson is alleged to have asked the plaintiff, "what is your reputation worth?" The plaintiff, believing that he would not receive a fair hearing and that defendant Johnson had already made up his mind, did not attend the hearing. Following the hearing, at which defendant Wetmore provided testimony that the plaintiff alleges was blatantly

---

[3] The plaintiff additionally asserts that defendant Johnson, the city's spokesperson, frequently discussed the plaintiff's alleged misconduct with the media.

false, defendant Johnson issued a letter, dated December 12, 2007, terminating the plaintiff's employment with the City on the basis that the plaintiff had repeatedly accessed pornography on city computers and had lied to city officials by failing to provide the Compaq computer initially.

Following the hearing and defendant Johnson's letter articulating his decision to terminate the plaintiff, the plaintiff was given access to the Compaq computer, and his computer forensic expert determined that the plaintiff had never accessed a pornographic website using the computer and that the pornographic images imprinted on the hard drive were the result of a "pop-up" or HTML re-direct. Plaintiff informed the City of the expert's findings on January 2, 2008 at a meeting attended by the City's mayor, city attorney, and deputy police chief. Subsequently, the City hired its own computer forensic expert, who concluded that the plaintiff had never accessed pornographic websites or images using either the Compaq computer or the IBM computer.

On January 24, 2008, the Board of Mayor and Aldermen held a special hearing to address the plaintiff's termination and voted by a margin of four to three to uphold the termination. The plaintiff alleges that he was not given any opportunity to be heard at that hearing and that the Board was not provided with the results of the police department's review of the IBM computer, the investigation of the Compaq computer conducted by the plaintiff's computer forensic expert, or the investigation of both computers conducted by the City's own expert.

## ANALYSIS

The plaintiff brought this lawsuit under 42 U.S.C. § 1983 asserting violations of the First and Fourteenth Amendments to the United States Constitution. (Docket No. 16 at 12-14.) The plaintiff also asserts that the defendants conspired to deprive him of his rights in violation of 42

5

U.S.C. § 1985. (*Id.* at 13-14.) Finally, the plaintiff asserts claims of wrongful discharge and defamation under Tennessee state law. (*Id.* at 14-16.) Defendant Randolph has moved to dismiss the Complaint or, in the alternative, for summary judgment, alleging that she is entitled to qualified immunity with respect to the plaintiff's claims and that the plaintiff has failed to state a claim on which relief may be granted.[4] (*See* Docket No. 31.)

## I. Qualified Immunity

In order to minimize the "general costs of subjecting officials to the risks of trial—distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service," the Supreme Court has recognized qualified immunity as an affirmative defense against an alleged violation of a constitutional right. *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982); *Caudill v. Hollan*, 431 F.3d 900, 911 (6th Cir. 2005). The Supreme Court has developed a two-part test to determine if the qualified immunity defense is available in a given case. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Goad v. Mitchell*, 297 F.3d 497, 501 (6th Cir. 2002). The first step requires the court to consider, in the light most favorable to the party asserting the injury, whether the facts alleged show that the official's

---

[4]In determining whether the motion should be considered a motion to dismiss or a motion for summary judgment, the court notes that discovery of defendant Randolph has been stayed pending resolution of the instant motion. (*See* Docket No. 66.) The only document outside the pleadings that defendant Randolph relies upon in support of her motion is an affidavit submitted by her attorney, Dale Conder, Jr. In that affidavit, Mr. Conder attests to the internet source of meeting minutes for the City's Board of Mayor and Aldermen. As these documents are public records, the court may take judicial notice of them in ruling on a motion to dismiss without treating the motion as one for summary judgment. *See Kostrzewa v. City of Troy*, 247 F.3d 633, 644 (6th Cir. 2001). Mr. Conder's affidavit also refers to and attaches a letter from the City Administrator to the plaintiff, with the subject "Re: Notice of Termination." For the purposes of the qualified immunity analysis, the court will disregard this letter as outside the pleadings and rule on defendant Randolph's motion as a motion to dismiss rather than as a motion for summary judgment.

6

actions violated a constitutional right. *Saucier*, 533 U.S. at 201 (citing *Siegert v. Gilley*, 500 U.S. 226, 232 (1991)). The qualified immunity inquiry comes to an end if a constitutional right would not have been violated were the allegations established. *Id.* If the plaintiff has established a violation of a constitutional right, the second step in the qualified immunity analysis is to determine whether the violated right was clearly established. *Id.* When determining whether a right was clearly established, the court must undertake the inquiry "in light of the specific context of the case, not as a broad general proposition." *Id.* "Qualified immunity [is] defeated if an official '*knew or reasonably should have known* that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff].'" *Harlow*, 457 U.S. at 815 (quoting *Wood v. Strickland*, 420 U.S. 308, 322 (1975)) (emphasis original to *Harlow*).

    *A.    Freedom of Speech*

The plaintiff asserts that his First Amendment rights were violated in that he engaged in constitutionally protected speech and was terminated as a result of that speech. (*See* Docket No. 16 ¶¶ 58-60.)

To establish a First Amendment retaliation claim, a plaintiff must demonstrate that (1) he "engaged in constitutionally protected speech"; (2) he "was subjected to adverse action or was deprived of some benefit"; and (3) "the protected speech was a 'substantial' or 'motivating' factor' in the adverse action." *Brandenburg v. Hous. Auth. of Irvine*, 253 F.3d 891, 897 (6th Cir. 2001) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). Where a plaintiff is a public employee, the plaintiff must also establish that the speech "involved matters of public interest or concern" and that the plaintiff's "interest in addressing these matters of public concern outweighs the interest of her employer 'in promoting the efficiency of the

7

public services it performs.'" *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003) (quoting *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968)); *Chappel v. Montgomery County Fire Prot. Dist. No. 1*, 131 F.3d 564, 573-74 (6th Cir. 1997) (quoting *Connick v. Myers*, 461 U.S. 138, 146, 157 (1983)). Speech addresses a matter of public concern if it relates to "any matter of political, social, or other concern to the community." *Rahn v. Drake Ctr., Inc.*, 31 F.3d 407, 412 (6th Cir. 1994). Once a plaintiff has established a *prima facie* case of retaliation, the burden then shifts to the defendant to demonstrate that "there were other reasons for the adverse action and that the same adverse action would have resulted even if the plaintiff had not engaged in the protected activity." *Leary*, 349 F.3d at 898.

The plaintiff asserts that he engaged in protected activity to the extent that he complained about defendant Randolph's conduct and cooperated with the ouster suit against defendant Randolph and then was terminated as a result of that speech. Defendant Randolph does not contest that the plaintiff engaged in speech on a matter of public concern and that the plaintiff's interest in that speech outweighed any interest on the part of the city. Instead, she argues that the plaintiff cannot establish causation—that is, she argues that she is entitled to qualified immunity because the plaintiff cannot establish a constitutional violation because defendant Randolph was not involved in the decision to terminate the plaintiff.

In support of her argument, defendant Randolph argues that her resignation became effective on November 14, 2007, that the plaintiff's initial suspension did not occur until November 28, 2007, and that two hearings that ultimately resulted in his termination did not occur until December 10, 2007 and January 24, 2008. She further alleges that she had no role in any of these decisions. The defendant's argument, however, does not withstand a close examination of the record. The plaintiff has alleged that defendant Randolph sent him text

8

messages threatening his job in August, September, and October 2007, indicating that, well prior to the effective date of her resignation, defendant Randolph was involved in a campaign to have the plaintiff removed from his job. (Docket No. 35 at 2.) The fact that defendant Randolph's actions did not happen to culminate in the plaintiff's termination until after defendant Randolph had left the employ of the city does not sever the chain of causation, nor does it shield her from liability.

Additionally, defendant Randolph argues that only a final decision-maker may be liable for a First Amendment retaliation claim. This argument rests largely on the authority of *Smith v. Floyd County Board of Education*, 401 F. Supp. 2d 789, 795-96 (E.D. Ky. 2005) ("As to causation, only final decision-makers may be held liable for First Amendment retaliation employment discrimination under § 1983."). However, the Sixth Circuit has expressly held that an "influential recommender" sued in his or her individual capacity may be liable for a First Amendment retaliation claim, despite the fact that the individual may not be a final decision-maker.[5] *Ward v. Athens City Bd. of Educ.*, No. 97-5967, 1999 U.S. App. LEXIS 22766, at *25 (6th Cir. Aug. 11, 1999); *see also Gilbrook v. City of Westminister*, 177 F.3d 839, 855 (9th Cir. 1999) ("[A] subordinate cannot use the non-retaliatory motive of a superior as a shield against liability if that superior never would have considered dismissal but for the subordinate's retaliatory conduct."); *Cohenour v. City of Winchester, Tenn.*, No. 4:04-cv-15, 2007 U.S. Dist. LEXIS 23969, at *12 (E.D. Tenn. Mar. 29, 2007) (noting that a plaintiff may succeed on a First Amendment retaliation claim against an individual who is not a final decision-maker if the

---

[5]The court notes that the "final decision-maker" question relating to individual liability for a First Amendment retaliation claim is distinct from the "final policymaker" question relating to municipal liability for a § 1983 claim. *See Pratt v. City of Lexington, Tenn.*, No. 07-1219, 2008 WL 4206329, at *5 n.7 (W.D. Tenn. Sept. 9, 2008).

plaintiff demonstrates a "causal nexus" between the individual's "improper animus" and the "decision of the final decision-maker").

Here, although defendant Johnson made the decision to terminate the plaintiff and the Board of Mayor and Aldermen ratified that decision, the plaintiff has alleged that defendant Randolph was not only motivated by an improper animus, but also that there was a causal nexus between her actions while she served on the Board and the plaintiff's ultimate termination. Indeed, her own text messages to the defendant, which occurred prior to both her resignation and the plaintiff's termination, and in which she made statements including "i get 2 fire u next," "I turn u into today u get fired," "u b fired," and "got whitmore [*sic*] watching u. he get u. u ain't no thang.," are evidence of this.

Having resolved the first part of the qualified immunity inquiry in favor of the plaintiff, the second step of the inquiry is to determine whether the right violated was clearly established. *Saucier*, 533 U.S. at 201. One need not look far to see that the right to freedom of speech and protection from retaliation is clearly established. *Hartman v. Moore*, 547 U.S. 250, 256 (2006) ("The law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out."); *Rankin v. McPherson*, 483 U.S. 378 (1987) ("It is clearly established that a State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech.") (citing *Perry v. Sindermann*, 408 U.S. 593, 597 (1972)); *Pickering*, 391 U.S. at 574 ("[S]tatements by public officials on matters of public concern must be accorded First Amendment protection despite the fact that the statements are directed at their nominal superiors."). The Sixth Circuit has repeatedly found that retaliation by public officials against a public employee's exercise of his free speech violates the First Amendment. *See Chappel*, 131

10

F.3d at 580 (finding that no reasonable official could have concluded that plaintiff could be disciplined for engaging in speech concerning public safety); *Williams v. Kentucky*, 24 F.3d 1526, 1537 (6th Cir. 1994) (finding defendants not entitled to qualified immunity where right to be free from adverse employment action on basis of speech concerning political patronage and corrupt activities was clearly established); *Boger v. Wayne County*, 950 F.2d 316, 325 (6th Cir. 1991) (recognizing that county employee could not be transferred in retaliation for exercise of free speech rights).

The law concerning employer retaliation against an employee for exercising his freedom of speech is well-established. Defendant Randolph knew, or should have known, that initiating retaliatory administrative action against the plaintiff because of the fact that he had reported her misconduct and cooperated in the ouster proceeding was a violation of his constitutional rights under the First Amendment. Defendant Randolph's assertion of qualified immunity, therefore, fails with respect to the plaintiff's First Amendment claim.

### B. *Procedural Due Process*

The plaintiff also asserts claims under the procedural component of the Fourteenth Amendment. The procedural component protects those benefits to which an individual has a legitimate claim of entitlement. *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005). "Such entitlements are . . . created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Id.* (quoting *Paul v. Davis*, 424 U.S. 693, 709 (1976)). The twin touchpoints of due process are the requirements of notice and an opportunity to be heard. *Flaim v. Med. College of Ohio*, 418 F.3d 629, 634 (6th Cir. 2005) (citing *Goss v Lopez*, 419 U.S. 565, 579 (1975)). Analyzing the sufficiency of a particular process requires a balancing of (1) "the private interest that will be affected by the

11

official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used"; (3) "the probable value, if any, of additional or substitute procedural safeguards"; and (4) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Sickles v. Campbell County*, 501 F.3d 726, 730 (6th Cir. 2007) (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). Here, defendant Randolph argues not only that the plaintiff did not have a interest subject to the protections of procedural due process, but also that he was afforded the process he was due. Additionally, defendant Randolph argues that the plaintiff waived his right to challenge the process afforded to him and that she is not liable as she had resigned at the time of both the December 10, 2007 hearing and the January 24, 2008 hearing, which collectively resulted in the plaintiff's termination.

The plaintiff claims a "liberty interest and property interest in continued employment" (Docket No. 16 ¶ 45) and a "liberty interest in not having his reputation destroyed by city officials" (Docket No. 35 at 13). First, with respect to the plaintiff's claim to a property interest in continued employment, the Sixth Circuit has noted that "the Due Process Clause encompasses the liberty to pursue one's trade, profession or calling, but does not grant the right to a specific job." *Bower v. Village of Mount Sterling*, 44 Fed. Appx. 670, 674-75 (6th Cir. 2002). As the plaintiff only alleges that he was denied his job as the Director of Solid Waste and not that he was denied the liberty to pursue his trade, profession, or calling, he has not demonstrated a violation of his constitutional rights on this account, and defendant Randolph is entitled to qualified immunity with respect to his procedural due process claim based on the alleged deprivation of his property interest in continued employment.

12

The court next turns to the plaintiff's liberty interest claim. "[A] person's reputation, good name, honor, and integrity are among the liberty interests protected by the due process clause of the fourteenth amendment," if damage to one's reputation is accompanied by "[s]ome alteration of a right or status . . . such as employment." *Quinn v. Shirey*, 293 F.3d 315, 319 (6th Cir. 2002) (quoting *Chilingirian v. Boris*, 882 F.2d 200, 205 (6th Cir. 1989)). Such claims are often referred to as "stigma-plus" claims. *See, e.g.*, *Cutshall v. Sundquist*, 193 F.3d 466, 479 (6th Cir. 2000); *Levin v. Childers*, 101 F.3d 44, 46 (6th Cir. 1996). Where an employee is stigmatized "by the voluntary, public dissemination of false information in the course of a decision to terminate his employment, the employer is required to afford him an opportunity to clear his name." *Id.* at 320 (quoting *Chilingirian*, 882 F.2d at 205). To demonstrate that he was entitled to a name-clearing hearing, a plaintiff must establish the following five elements:

> First, the stigmatizing statements must be made in conjunction with the plaintiff's termination from employment. . . . Second, a plaintiff is not deprived of his liberty interest when the employer has alleged merely improper or inadequate performance, incompetence, neglect of duty or malfeasance. . . . Third, the stigmatizing statements or charges must be made public. Fourth, the plaintiff must claim that the charges made against him were false. Lastly, the public dissemination must have been voluntary.

*Id.*

Defendant Randolph asserts that the plaintiff has not established a stigma-plus claim because any dissemination of false information about the plaintiff by defendant Randolph occurred among "agents of the City" and did not, therefore, constitute "public dissemination." (Docket No. 41 at 5-6.) Defendant Randolph further argues that she was not involved in either the December 10, 2007 hearing or the January 24, 2008 hearing, as her resignation from the Board became effective on November 14, 2007. (Docket No. 41 at 4-5.) Under the stigma-plus doctrine, "perfect parity in the origin of both the 'stigma' and the 'plus' is not required to state

13

the infringement of a "stigma-plus' liberty interest," so long as "both 'stigma' and 'plus' are claimed to be sufficiently proximate." *Velez v. Levy*, 401 F.3d 75, 89 (2d Cir. 2005). Here, the plaintiff has alleged that defendant Randolph instigated the investigation that culminated in the plaintiff's termination, that city representatives disseminated false allegations about the plaintiff's conduct to members of the media and the public, and that defendant Johnson and the Board of Mayor and Aldermen were ultimately responsible for the decision to terminate the plaintiff on the basis of these false allegations. Therefore, the collective actions of the defendants do, indeed, appear to implicate the plaintiff's liberty interests. However, the court need not rule on this question, as the plaintiff's claim against defendant Randolph fails for another reason.

The Second Circuit has noted that, where different actors are responsible for the "stigma" and the "plus," as is the case here, "for any number of reasons . . . one or more defendants whose actions collectively *implicate* a liberty interest may not be *liable* for the deprivation of that liberty interest." *Id.* at 89 n.12. This is one such case. The fact is that defendant Randolph did not have the power to provide the process due the plaintiff in the form of a name-clearing hearing. *Velez* is instructive on this point. In that case, the court held that the defendant board members, who had fabricated a story about the plaintiff's criminal history so to remove the plaintiff from the board, could not be liable for the alleged due process violation because those board members did not have the ability to provide the plaintiff with the process she was due, as they "did not undertake or oversee the investigation, and they could order neither pre-removal review nor post-removal remedies." *Id.* at 93. Defendant Randolph's resignation from the Board of Mayor and Aldermen became effective weeks prior to the December 10, 2007 hearing. Though she may well have instigated the investigation initially, at the point that the plaintiff was

14

entitled to due process in the form of a name-clearing hearing, defendant Randolph was no longer a member of the Board and thus had no power to provide process either prior to or following the plaintiff's termination. Rather, the obligation to provide the process that was due rested with others.[6]

As the plaintiff has not demonstrated that defendant Randolph's actions constituted a violation of his procedural due process rights with respect to either his continued employment or his reputation, defendant Randolph is entitled to qualified immunity with respect to these claims.

C. *Substantive Due Process*

Finally, the plaintiff claims "a liberty interest and a property interest in continued employment" with the City. (Docket No. 16 ¶ 45.) Substantive due process protects those interests that may be considered "fundamental" interests "implicit in the concept of ordered liberty." *Sutton v. Cleveland Bd. of Educ.*, 958 F.2d 1339, 1351 (6th Cir. 1992). The Sixth Circuit has repeatedly rejected attempts to include property interests in employment among the interests protected by substantive due process.[7] *Id.* (noting that state-created right to tenured

---

[6]The questions of whether that process was, in fact, sufficient and whether the plaintiff waived his right to challenge the process are issues raised by defendant Randolph that need not be addressed here in light of this court's ruling.

[7]The questions of whether a particular interest is entitled to procedural due process protection and whether that same interest is entitled to substantive due process protection are distinct, as "not all property interests that create procedural due process protections necessarily create substantive due process rights." *Mansfield Apartment Owners Ass'n v. Mansfield*, 988 F.2d 1469, 1477 (6th Cir. 1993). In explaining the difference between those interests protected by substantive due process and those protected by procedural due process, the Sixth Circuit has stated, "[w]hile property interests are protected by procedural due process even though the interest is derived from state law rather than the Constitution, substantive due process rights are created only by the Constitution." *Charles v. Baesler*, 910 F.2d 1349, 1354 (6th Cir. 1990), *cited in Mansfield*, 988 F.2d at 1477.

15

position lacks substantive due process protection); *Charles v. Baesler*, 910 F.2d 1349, 1355 (6th Cir. 1990) (finding no substantive due process protection for state-created promotion rights); *see also Bell v. Ohio State Univ.*, 351 F.3d 240, 249-50 (6th Cir. 2003) (detailing reasons for maintaining narrow number of interests protected by substantive due process). Therefore, to the extent that the plaintiff's substantive due process claim is premised on a property interest in continued employment, the plaintiff has not established a violation of a constitutional right and defendant Randolph is entitled to qualified immunity with respect to this claim.

Additionally, to the extent that the plaintiff's substantive due process claims are premised on the alleged violation of his free speech rights under the First Amendment (*see* Docket No. 35 at 20), the Supreme Court has stated that, where the Constitution "provides an explicit textual source" of protection for a plaintiff's claims, those claims should be analyzed under that provision rather than under the "more generalized notion of 'substantive due process.'" *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). The plaintiff's substantive due process claims arising out of his allegations that he was terminated in retaliation for constitutionally-protected speech therefore are subsumed by the analysis conducted under the First Amendment *supra*.

## II.     Failure to State a Claim

In addition to her qualified immunity arguments, defendant Randolph asserts that the plaintiff has failed to state a conspiracy claim under 42 U.S.C. § 1985. (Docket No. 32 at 3-6.) As the plaintiff has conceded its § 1985 claims against defendant Randolph (Docket No. 35 at 1), those claims will be dismissed.

16

## CONCLUSION

For the reasons discussed herein, the Motion of Defendant Mary Dodson Randolph to Dismiss and/or for Summary Judgment on the Grounds of Qualified Immunity and for Failure to State a Claim will be granted in part and denied in part.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge