# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **JOE T. WILLIAMS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:08-cv-0164** |
| | ) | **Judge Trauger** |
| **THE CITY OF FRANKLIN, TENNESSEE,** | ) | |
| **JAMES R. JOHNSON,** | ) | |
| **RANDY WETMORE,** | ) | |
| **SHIRLEY HARMON,** | ) | |
| **and MARY DODSON RANDOLPH,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Pending before the court is the Motion for Summary Judgment filed by the defendant City of Franklin, Tennessee (Docket No. 89), to which the plaintiff has responded (Docket No. 119), and the defendant has replied (Docket No. 120). For the reasons discussed herein, the defendant's motion will be granted in part and denied in part.

## FACTS

Joe T. Williams, the plaintiff in this matter, served as the Director of Solid Waste for the defendant City of Franklin, Tennessee (the "City") from 1998 until his termination on December 12, 2007 or January 24, 2008.[1] This case arises out of the events in late 2007 and early 2008 that lead up to, and culminated in, Williams' termination.[2]

---

[1] There is some question as to whether Williams' termination was effective on December 12, 2007 or on January 24, 2008, as will be discussed in greater detail *infra*.

[2] Unless noted otherwise, the facts are drawn from the Response of Plaintiff to Defendant's Statement of Undisputed Facts (Docket No. 111), from the City's Response to

On multiple occasions during the summer of 2007, Williams complained to city officials and the police about anonymous, threatening text messages that he and members of his family had received.[3] Williams informed the police that he believed the messages had come from Mary Dodson Randolph, who, at the time, served as an alderman on the City's Board of Mayor and Aldermen ("BOMA"). On August 8, 2007, the City filed an ouster suit against Randolph based on her harassment of a number of City residents, including Williams and his family. Williams cooperated with the City's ouster suit and had a number of conversations and meetings with Karen Beyke, the City Attorney, regarding the ouster suit.[4] As the ouster suit proceeded, Williams continued to receive intimidating text messages, although these text messages now included specific threats on Williams' employment with the City.[5]

On September 11, 2007, Randolph tendered her resignation from BOMA, effective November 14, 2007. After she agreed to resign but before that resignation became effective, Randolph articulated certain complaints about Williams in an email, dated October 9, 2007, to

Plaintiff's Statement of Disputed Facts (Docket No. 128), and from the affidavits, deposition excerpts, and other exhibits submitted by the parties in support of and opposition to the City's motion for summary judgment.

[3]These messages included such statements as "u aint no hero. aint got no fucking nuts. aint no friend. aint a man" and "made promise to trader I not u but I hurt joew. I hurt him with power people. went to other alderlady house couldn't get thru. I go back now to aldrandolph." (Docket No. 1 Ex. A.)

[4]Williams never signed an affidavit or gave testimony in the context of the ouster suit, and the City characterizes his role as "insignificant" and not necessary to the prosecution of the ouster suit.

[5]These messages included such statements as "time almost up. hear u got money now. I b in touch tues or wed 4 u 2 give me mine. who alderman I get 2 fire u next?," "I turn u into today u get fired," "u been turned in. . . . u aint gone find work noplace then," and "u b fired." (Docket No. 1 Ex. B.)

City Administrator Jay Johnson, Assistant City Administrator Randy Wetmore, and David

Parker, Williams' direct supervisor.[6]  In the email, Randolph stated that Williams spent the

majority of his workday "analyzing other department's budgets and operations, playing

computer games, looking at blogs and sending inside information to blog administrators" and

added, "You would be amazed at the type of stuff he has on his office computer and what he

does with it."  Randolph's email also stated, "I guess you could say I am tattling on him but it is

my opinion that what I am doing is right and in the best interests of the residents of the City of

Franklin. . . . For someone to attempt to make and continue to attempt to make my life miserable

and not tell the whole story will no longer be tolerated by me. . . . One little stupid [incident] has

set me off and I have to vent it out!"

Subsequently, on October 19, 2007, based on Randolph's allegations about the content of

Williams' computer, Wetmore and Parker asked Williams to turn over his laptop, and Williams

provided them with his City-issued IBM laptop computer (the "IBM Computer").  Wetmore then

reviewed the IBM Computer and found five internet "cookies" that, he believed, indicated that

Williams had visited pornographic websites using the IBM Computer.  Wetmore asked the

police department to determine the nature of the websites and was informed by the police

department that the websites were "pornographic in nature."  As a result, Williams was

suspended for five days for violating the City's Human Resources Manual and its Policy for the

Use of Computer, Internet and E-Mail.

---

[6]Although the email does not mention Williams by name, the parties do not dispute that
Williams was, indeed, the subject of the email.

On October 22, 2007, Williams submitted a written complaint to Human Resources Director Shirley Harmon and to Parker, Williams' supervisor, complaining that Randolph's accusations were in retaliation for Williams' participation in the City's ouster suit against Randolph. On November 9, 2007, as part of an investigation into Williams' retaliation complaint, Wetmore and Harmon interviewed Randolph and asked her to clarify the statement in her October 9, 2007 email that she would "no longer [tolerate]" Williams' "attempt to make my life miserable and not tell the whole story." Randolph stated that this comment pertained to Williams' conversations with Beyke, the City Attorney.[7] Also during this meeting, Randolph informed Wetmore and Harmon that they should "check [Williams'] old computer," which, Randolph stated, was stored under Williams' desk.[8]

Around this same time, Williams appealed the five-day suspension he had received as a result of the investigation into the contents of the IBM Computer. On November 20, 2007, the City held a hearing with respect to Williams' suspension (the "November Hearing"). At the November Hearing, Williams admitted to using the IBM Computer to play games and read blogs, although he denied using it to visit pornographic websites and speculated that someone else may have used the computer to access such sites while he was traveling out of town at a conference. Johnson, who served as the hearing officer, reduced Williams' five-day suspension to three days, with a six-month probationary period, and expressed concern about Randolph's

---

[7]Wetmore later testified that he was aware, at the time, that Williams had spoken to Beyke about the ouster suit and that he knew of no other subject that Williams and Beyke had discussed.

[8]Ultimately, Wetmore and Harmon concluded that there was no evidence to support Williams' complaint that Randolph was retaliating against him.

motives in sending the October 9, 2007 email that triggered the investigation of the IBM Computer, stating that the email "bother[ed] [him] in that it really wasn't that she was expressing concern—my opinion from reading it—she wasn't expressing concern about inappropriate use of city property; she wasn't expressing concern particularly about inappropriate use of [Williams'] time; she was retaliating because she was mad at [Williams]" and that he believed, from reading the email, that Randolph had accessed Williams' computer.

Shortly after the November Hearing, Wetmore took possession of a second City-issued computer that was in Williams' possession (the "Compaq Computer"), as Randolph had alleged in her interview with Wetmore and Harmon. The police department reviewed the Compaq Computer and discovered the existence of forty-one pornographic images on the computer's hard drive.[9] Subsequently, on November 28, 2007, Wetmore and Parker sent a letter to Williams stating that the review of the Compaq Computer revealed that "multiple pornographic images [were accessed on that computer] over an extended period of time" and that Williams was suspended, without pay, pending another hearing in December 2007 (the "December Hearing").[10] The letter stated that, at the December Hearing, Williams would be provided the

---

[9]Williams alleges that the police department's investigation was faulty and that the Compaq Computer was not adequately protected from tampering and spoliation while in the City's possession. The City does not dispute that the police officer in charge of the investigation had never previously conducted a computer investigation and that he informed his supervisors that he was uncomfortable being in charge of the investigation. The City argues, however, that the parties' dispute over the adequacy of the investigation is not material.

[10]The November 28, 2007 letter also stated that Williams "failed to inform us that you had a second computer" when Wetmore retrieved the IBM Computer from Williams. However, the City does not dispute that, when Wetmore first took possession of the IBM Computer, he simply asked Williams for his singular "laptop," rather than asking for Williams' plural "laptops" or for all City-owned computers in Williams' possession. Moreover, there is no indication that Williams attempted to conceal his possession of the Compaq Computer at any

opportunity to "present testimony, give evidence and examine and cross-examine witnesses" and that Williams was entitled to consult with an attorney, but that the attorney would not be permitted inside the hearing. The letter further stated that Williams "may also choose to waive [his] right to the hearing" and that, if so, a decision would be rendered on the evidence collected.

In preparation for the December Hearing, both Williams and his attorney requested access to the Compaq Computer so that Williams might have his own expert review the computer's contents. Although the Assistant City Attorney recommended, on the basis of her consultations with Beyke, the City Attorney, that Williams be provided with access to the Compaq Computer "based on the principle of due process and to allow Mr. Williams to fully defend himself against the allegations," Wetmore nevertheless denied Williams access to the Compaq Computer prior to the December Hearing. Additionally, the Police Department reviewed the contents of the IBM Computer, which was the basis of Williams' original suspension, and was "unable to find any illicit pictures," "suspect websites," or "illicit images." Although this finding was conveyed to Wetmore prior to the December Hearing, it was never conveyed to Williams.[11]

The December Hearing, originally scheduled for December 5, 2007, ultimately took place on December 10, 2007. Moments before the hearing was to start, Williams met with

point.

[11]The City contends that this finding was in error, as the Police Department subsequently reviewed the computer again and did find evidence that someone visited pornographic websites using the IBM Computer. However, regardless of the accuracy of the finding, the relevant fact is that, at the time of the December Hearing, Wetmore was in possession of apparently mitigating evidence and this mitigating evidence was not provided to Williams.

Johnson, who again was serving as the hearing officer, and Johnson asked Williams, "What is your reputation worth?" Williams decided not to attend the hearing because, as he later testified, he believed he would not be afforded a fair hearing. The hearing took place without Williams in attendance. At the hearing, Wetmore testified that the findings on the Compaq Computer were "just like it was during the first one," referring to the IBM Computer, and that it was "egregious to find it the second time," despite the fact that Wetmore recently had been informed by the police department that the IBM Computer did not contain any illicit material. Wetmore further testified that Williams had "withheld information" by failing to turn over the Compaq Computer during the initial investigation, although there is no evidence of that, and Wetmore has since conceded that Williams did nothing to hide information. Two days after the hearing, on December 12, 2007, Johnson issued a letter stating that Williams had "repeatedly accessed" pornography on City-issued computers and had lied about his possession of those computers, informing Williams that he was terminated "effective immediately," and advising Williams that he was entitled to appeal the decision to BOMA.[12]

Following the December Hearing, Williams was advised that BOMA would review Johnson's determination and that Williams would be given the opportunity to respond to the charges against him. Williams was advised further that the hearing would be open to the public

---

[12]Although the letter unequivocally states that Williams was terminated "effective immediately," the City asserts that Johnson, in his position as City Administrator, did not have the authority to terminate Williams. According to the City, Johnson only recommended termination to BOMA, and the termination did not become effective until BOMA accepted Johnson's recommendation at a January 24, 2008 hearing. In any case, regardless of whether it is characterized as a final decision or merely as a recommendation, Johnson's determination as articulated in the December 12, 2007 letter would ultimately be ratified by BOMA, as discussed in greater detail *infra*.

and that Williams or his counsel would have the opportunity to address BOMA. Additionally, Williams was provided with access to the Compaq Computer so that he could have an expert review the contents of the computer. Williams' expert reviewed the computer and discovered that the pornographic images were imprinted on the hard drive in a span of thirteen seconds as a result of an HTML re-direct or "pop-up." Williams' expert concluded that Williams had no control over these images and, thus, that there was no basis for the City's findings that Williams had "repeatedly accessed" pornography and had viewed "multiple pornographic images . . . over an extended period of time."[13]

The hearing before BOMA took place on January 24, 2008 (the "January Hearing"). Prior to the January Hearing, the members of BOMA each received and reviewed a packet of materials prepared by city officials.[14] Immediately after the January Hearing commenced, Alderman Dan Klatt, a member of BOMA, made a motion to accept Johnson's determination.[15] As a result, Williams was not given an opportunity to address BOMA, and Johnson's determination was accepted by BOMA by a vote of four to three.

---

[13]The City also had an expert review both the Compaq Computer and the IBM Computer around this time. With respect to the Compaq Computer, the City's expert concluded that the existence of the forty-one pornographic images were the result of a pop-up over which the user had no control, but that the presence of these images were consistent with the user visiting a pornographic website. Further, with respect to the IBM Computer, the City's expert found that, although there were no pornographic images on that computer, the IBM Computer did contain "cookies" consistent with visits to pornographic websites.

[14]This packet was filed with the court under seal. Williams contends that certain of the material contained in the packet, including, for example, a reference to certain pornographic images ostensibly retrieved from the IBM Computer, was false.

[15]Klatt later testified that he believed that Williams already had been afforded an opportunity to clear his name and that Williams should not have been provided with an opportunity to be heard because the issue needed to remain private.

<u>**ANALYSIS**</u>

Williams asserts that the City terminated him as a result of his participation in the ouster suit against Randolph and his related complaints to the police and that, in doing so, the City deprived him of property and liberty interests without due process, in violation of 42 U.S.C. § 1983, and violated his First and Fourteenth Amendment rights to free speech.[16] The City contends that Williams' participation in the ouster suit and his complaints to the police had nothing to do with his termination and moves for summary judgment with respect to Williams' claims.

**I.     Summary Judgment Standard**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *McLean*

---

[16]Williams has indicated that he is no longer pursuing claims against the City under 42 U.S.C. § 1985 and for wrongful termination. (*See* Docket No. 119 at 1 n.1.) Additionally, Williams has dismissed his claims against Johnson, Wetmore, Harmon, and Randolph. (Docket Nos. 85 & 130.)

*v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the nonmoving party fails to make a sufficient showing on an essential element of the case with respect to which she has the burden, however, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999). To preclude summary judgment, the nonmoving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). If the evidence offered by the nonmoving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249-52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 431 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247-49).

## II.     Due Process

A plaintiff may bring suit under 42 U.S.C. § 1983 for a deprivation of his constitutionally protected property and liberty interests. *Chilingirian v. Boris*, 882 F.2d 200, 203 (6th Cir. 1989) (citing *Ramsey v. Bd. of Educ.*, 844 F.2d 1268, 1271 (6th Cir. 1988)). Here, Williams alleges

that he had a property interest and a liberty interest in his continued employment with the City

and that he was deprived of these interests without due process.

A.       *Property Interest*

Where a public employee has a property interest in employment, due process requires

that the employee may not be terminated without first being provided with notice of the charges

against him, an explanation of the evidence on which the employer bases its decision, and an

opportunity to present his side of the story.  *Farhat v. Jopke*, 370 F.3d 580, 595 (6th Cir. 2004)

(citing *Buckner v. City of Highland Park*, 901 F.2d 491, 494 (6th Cir. 1990)); *see also Cleveland*

*Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (stating that due process requires "some

kind of a hearing prior to the discharge of an employee who has a constitutionally protected

property interest in his employment").  Before determining whether the process provided by the

City prior to Williams' termination satisfies this standard, however, the court must consider the

City's argument that Williams did not, in fact, have a property interest in continued employment

with the City.

The question of "[w]hether a property interest exists is not determined by reference to the

Constitution; rather, property interests are created and their dimensions are defined by existing

rules or understandings that stem from an independent source such as state law—rules or

understandings that secure certain benefits and that support claims of entitlement to those

benefits." *Ludwig v. Bd. of Trustees*, 123 F.3d 404, 409 (6th Cir. 1997) (citing *Bd. of Regents v.*

*Roth*, 408 U.S. 564 (1972)).  Although property rights may exist in public employment, *Gregory*

*v. Hunt*, 24 F.3d 781, 784 (6th Cir. 1994) (citing *Roth*, 408 U.S. at 577), "a public employee does

not have a property interest in continued employment when his position is held at the will and

pleasure of his superiors and when he has not been promised that he will only be terminated for good cause," *Chilingirian*, 882 F.2d at 203 (citing *Bishop v. Wood*, 426 U.S. 341 (1976)).  Thus, determining whether Williams had a property interest in employment with the City requires a determination of whether his employment was at-will or whether there was an understanding that Williams could only be terminated for good cause.

Article VII of the City's Charter states that all department heads, such as Williams, "serve at the will and pleasure" of BOMA.  As such, the City contends that Williams could be terminated by BOMA at any time and for any reason and, thus, does not have any property interest in his continued employment.  Williams, however, argues that the City's focus on this single provision of the Charter is myopic and ignores the disciplinary procedures set out in the City's Municipal Code and its Human Resources Manual which, Williams asserts, demonstrate the existence of a property interest in his employment.

Section 4-203 of the City's Municipal Code provides that all city employees fall into one of two categories: "classified" or "exempt."  The section then enumerates certain job categories that are exempt—for example, elected officials, volunteers, city attorneys, part-time employees, and the city administrator are all exempt—and specifies that all positions not falling into one of those enumerated job categories are classified.  As Williams' position as the Director of Solid Waste does not fall into any of the job categories enumerated in Section 4-203, his position was therefore classified rather than exempt.

The Municipal Code and the Human Resources Manual provide for certain procedures to which classified employees are entitled prior to being disciplined or terminated.  Specifically, Sections 4-215 and 4-217 of the Municipal Code state that a classified employee who is

disciplined must be notified, in writing, of the penalty and the basis for the penalty and has the right to appeal that determination. Similarly, Rule XII of the Human Resources Manual provides that an employee may only be disciplined after a departmental hearing and that the employee must be notified, in writing, of the penalty and the reasons for the penalty. Rule XII further provides that an employee has a right to appeal a disciplinary decision and the right to be heard publicly, to be represented by counsel, and to present evidentiary facts at that appeal.

Ordinarily, in the two-step disciplinary process prescribed by the Municipal Code and the Human Resources Manual, an employee's department head serves as the hearing officer and any appeal is made to the City Administrator. The system, obviously, does not function where the disciplined employee himself is a department head, like Williams. Thus, Williams argues, where a department head is subject to discipline, the Charter empowers the City Administrator to function as the hearing officer and empowers BOMA to hear the appeal. According to Williams, when read in this context, the Charter provision on which the City relies simply substitutes BOMA as the entity with the authority to terminate a department head, such as Williams, and does not supplant the rights afforded to all classified employees, including department heads, in the Municipal Code and the Human Resources Manual.

The Sixth Circuit Court of Appeals has held that a prescribed process much like that delineated by the Municipal Code and the Human Resources Manual can establish a property right in public employment. *See Silberstein v. City of Dayton*, 440 F.3d 306 (6th Cir. 2006). In *Silberstein*, the city's charter provided that a classified employee could not be terminated until presented with the reasons for the termination and afforded the opportunity to be heard. *Id.* at 311. The court noted that the charter created a property interest for classified employees, *id.* at

312, and went on to hold that, because the plaintiff's position rendered her a classified employee, she "had a property interest in her employment that triggered due process protection," *id.* at 315.

The City argues that Williams was an at-will employee and did not have a property interest in continued employment because the Municipal Code does not limit the reasons for which a classified employee may be terminated. The City is correct to the extent that the Code states that a classified employee may be disciplined "for any one or more of, but [not] limited to, the following reasons," and then lists reasons such as dishonesty, insubordination, felony conviction, and violation of departmental rules. The court, however, does not read this language as providing that a classified employee may be terminated for any reason whatsoever or for no reason at all but, rather, as providing that there may be other unspecified offenses for which discipline, including termination, would be appropriate. Moreover, the fact that the Municipal Code and the Human Resources Manual provide that a classified employee must be notified of the reason for his termination lends further support to the conclusion that a classified employee may only be terminated for some cause.

The facts in this case are strikingly similar to those in *Silberstein*. As in that case, classified employees of the City cannot be terminated until they are provided with the reasons for their termination, the opportunity to be heard, and the chance to appeal the decision. These are precisely the types of protections that led the court in *Silberstein* to determine that classified employees had a property interest in continued employment, and those protections compel the same conclusion in this case. Although the City argues that the existence of disciplinary procedures cannot establish a property interest, *Silberstein* makes clear that, indeed, they can. Moreover, the court is not persuaded to the contrary by the single statement in the Charter that

department heads serve at the will and pleasure of BOMA.  There is no indication that this provision should be interpreted to eviscerate the protections otherwise afforded to classified employees, including department heads.  Instead, it simply reflects that BOMA ultimately determines whether a department head such as Williams is subject to discipline, including termination, under the procedures provided for such discipline.

As Williams had a property interest in continued employment and, thus, was entitled to due process before being deprived of that interest, the court turns to the question of whether Williams received the process that was due.  The City argues that Williams received the process that was due at the December Hearing because he had notice of the hearing and the charges against him and the opportunity to appear and address those charges.  The City argues that, by deciding not to attend the December Hearing, Williams waived his right to that hearing.

However, Williams has adduced facts that demonstrate that a question of fact exists as to whether the December Hearing constituted due process.  First, although Williams was aware of the charges against him prior to the December Hearing, he had been denied access to the Compaq Computer and thus was unable to prepare a defense to the charges relating to that computer.  Further, just minutes before the hearing, Johnson, who was serving as the hearing officer, asked Williams "what [his] reputation was worth," casting grave doubt not only on Johnson's impartiality but also on the adequacy of the hearing itself.  Finally, the fact that Williams explicitly was promised the opportunity to be heard at the January Hearing and then denied that opportunity when a member of BOMA cut off the hearing by calling for a vote almost immediately after the hearing began raises the legitimate question of whether Williams

would actually have been afforded the opportunity to be heard at the December Hearing, as promised, had he attended that hearing.

For these reasons, the court will deny the City's motion for summary judgment with respect to Williams' claim that he was deprived of his property interest in continued employment without due process.

B.     *Liberty Interest*

An individual has a liberty interest in his "reputation, good name, honor, and integrity" and "in being free to move about, live, and practice his profession without the burden of an unjustified label of infamy." *Joelson v. United States*, 86 F.3d 1413, 1420 (6th Cir. 1996) (quoting *Chilingirian*, 882 F.2d at 205); *see also Ludwig*, 123 F.3d at 410 ("An injury to a person's reputation, good name, honor, or integrity constitutes the deprivation of a liberty interest when the injury occurs in connection with an employee's termination."). A plaintiff may establish a deprivation of a liberty interest in employment by demonstrating the public disclosure of stigmatizing information that "so negatively affects his or her reputation that it effectively forecloses the opportunity to practice a chosen profession." *Joelson*, 86 F.3d at 1420.

Where an employee has such a liberty interest, the employee may not be deprived of that interest without being afforded notice and opportunity to be heard and to refute the charges against him, if the employee has requested a "name-clearing hearing." *Ludwig*, 123 F.3d at 410. "It is the denial of the name-clearing hearing that causes the deprivation of the liberty interest without due process." *Quinn v. Shirey*, 293 F.3d 315, 320 (6th Cir. 2002); *see also Brown v. City of Niota*, 214 F.3d 718, 723 (6th Cir. 2000) ("Once a plaintiff has established the existence of [a liberty interest], he is entitled to a name-clearing hearing if he requests one."). Thus, it is

incumbent on the employee to request a name-clearing hearing, as it is the employer's denial of that request that forms the basis of a valid due process claim, and a plaintiff's claim is barred if he failed to request a name-clearing hearing. In this case, the City concedes that Williams had a liberty interest but argues that Williams failed to request a name-clearing hearing and that this is fatal to his claim.

The Sixth Circuit Court of Appeals has provided some guidance as to what constitutes a sufficient request for a name-clearing hearing. In *Ludwig*, the court held that a letter alleging that the employer had denied the employee due process did not constitute a request for a name-clearing hearing. *Ludwig*, 123 F.3d at 411. The court noted that the employee had alleged both a liberty interest claim and a property interest claim, and found that the letter did not alert the employer that the employee was "complaining about a lack of due process in connection with a liberty interest as opposed to a lack of due process in connection with his claimed property interest, a claim which he had been asserting for some time." *Id.*

In *Quinn*, the court considered a case where the employee had informed his employer that he was innocent of the charges against him and requested that the employer delay deciding whether he should be fired until an audit and grand jury investigation were concluded. *Quinn*, 293 F.3d at 324. Although the plaintiff in *Quinn*, unlike the plaintiff in *Ludwig*, asserted only a liberty interest claim and not a property interest claim, the court nevertheless held that the employee's statements did not constitute a request for a name-clearing hearing because they did not sufficiently apprise the employer that he sought to clear his name. *Id.* at 324-25.

There were a number of communications in late 2007 and early 2008 between Williams (and his attorney) and the City in which Williams might have requested a name-clearing hearing.

First, on December 4, 2007, Williams' attorney sent a letter to the Assistant City Attorney, making several requests in advance of the December Hearing, including that the hearing be postponed and that Williams be provided access to the Compaq Computer.  The letter concludes that, if the City denied those requests, Williams would "maintain the position that the City has denied Mr. Williams due process and that any disciplinary hearing should be disregarded and considered of no legal effect."  Subsequently, on January 3, 2008, Williams' counsel sent another letter to the Assistant City Attorney alleging that Williams had been denied "the basic legal requirement and courtesy of due process which could have avoided this entire mess" and stating that, if a decision to reconsider Williams' termination were not made by the next day, "we will start taking the necessary steps to tell [Williams'] side of the story."  On January 17 and 18, 2008, Williams' counsel and the Assistant City Attorney communicated by email with regard to the procedure for the January Hearing, including whether the hearing would be open to the public and whether Williams would be afforded the opportunity to present evidence at the hearing.  Finally, on January 28, 2008, shortly after the January Hearing, Williams' attorney sent another letter to the Assistant City Attorney that stated, "Pursuant to the Charter for the City of Franklin, Tennessee and the Human Resources Manual, Joe Williams hereby demands the hearing afforded to him by Rule XII of the Human Resources Manual [which] affords him an appeal of any disciplinary action, including dismissal. . . ."

To establish that he requested a name-clearing hearing, at the very least, Williams must have apprised the City that he sought to clear his name.  However, there is no indication that he did so.  None of the communications from Williams or his attorney specifically addressed Williams' claimed liberty interest, nor did any of the communications request an opportunity for

Williams to clear his name. Instead, the communications all pertained to Williams' employment and the disciplinary process that resulted in his termination, and, thus, they addressed only his property interest claim. Even the January 28, 2008 letter, in which Williams demanded an appeal of the January Hearing, focused on the disciplinary action taken by the City —and, therefore, pertained to his property interest claim—rather than any stigma or reputational harm that Williams alleges to have suffered, as alleged in his liberty interest claim.

Williams contends that the City's argument that he never requested a name-clearing hearing is a red herring, arguing that the City actually provided a name-clearing hearing at the January Hearing but that the January Hearing did not comport with due process because Williams was not afforded the right to defend himself at that hearing. This argument, however, is inconsistent with evidence that demonstrates that the focus of the January Hearing was on Johnson's determination that Williams be terminated. Specifically, in his December 12, 2007 letter regarding the outcome of the December Hearing, Johnson stated that Williams could "appeal this decision to the full Board of Mayor & Aldermen," and a number of members of BOMA have since testified that the purpose of the January Hearing was to vote on Johnson's determination.[17] The January Hearing thus served as a disciplinary hearing regarding the allegations of misconduct that had been leveled against Williams and the punishment meted out as a result. As the Sixth Circuit Court of Appeals has noted, disciplinary hearings of this sort are

---

[17]Williams notes that, when Alderman Klatt moved for a vote at the January Hearing before Williams had a chance to speak, Klatt stated that he believed Williams had already been given the opportunity to "clear his name." Klatt's stray remark cannot establish, however, that the January Hearing constituted a name-clearing hearing of the type necessary to establish a liberty interest claim, in light of the significant evidence regarding the disciplinary focus of the January Hearing.

distinct from name-clearing hearings.  *See Gunasekera v. Irwin*, 551 F.3d 461, 469 n.5 (6th Cir. 2009) ("A name-clearing hearing is not a venue for an employer to determine the proper punishment, but rather an opportunity for an individual to confront a public stigma that has already been imposed by an employer.").  The hearing did not serve as an opportunity for Williams to clear his name and publicly rehabilitate his reputation and, thus, was not the name-clearing hearing required prior to the deprivation of a liberty interest in employment.

As Williams never requested a name-clearing hearing, the City is entitled to summary judgment with respect to his claim that he was deprived of his liberty interest in his employment without due process.

## III.    Free Speech

To determine whether a public employee's termination violated the First Amendment, a court must consider, first, whether the relevant speech addressed a matter of public concern. *Rodgers v. Banks*, 344 F.3d 587, 596 (6th Cir. 2003) (citing *Connick v. Myers*, 461 U.S. 138, 143 (1983)).  If the speech did address a matter of public concern, the court must then "balance the interests of the public employee, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)).  "Finally, the court must determine whether the employee's speech was a substantial or motivating factor in the employer's decision to take the adverse employment action against the employee." *Id.* (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).  The crux of Williams' First Amendment claim is that he was terminated because of his

20

speech in connection with the ouster suit against Randolph and his related complaints to the police, speech that the City concedes was protected under the First Amendment.

The City argues, however, that it is not liable for the violation of Williams' First Amendment rights because that violation did not result from the decision of an official with final decision-making authority. A municipality is liable under § 1983 for a single decision by a municipal official only if the official was the one with "final authority to establish municipal policy with respect to the action ordered."[18] *Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1985)). A plaintiff can establish municipal liability by demonstrating that the final decision-maker delegated his or her final decision-making authority, *id.* (citing *Pembaur*, 475 U.S. at 483), or that the final decision-maker ratified the unconstitutional decision of a subordinate, *see Praprotnik*, 485 U.S. at 126-27; *Monistere v. City of Memphis*, 115 Fed. Appx. 845, 853 n.6 (6th Cir. 2004). The question of whether a particular official has final decision-making authority is one of state law that is determined by reference to such sources as "statutes, ordinances, and regulations, and less formal sources of law such as local practice and custom." *Feliciano*, 988 F.2d at 655.

As discussed previously, the City's Charter vests BOMA with the power to terminate department heads such as Williams. The City argues that BOMA exercised this authority by voting, at the January Hearing, to accept Johnson's determination. The City further argues that BOMA was not motivated by Williams' protected speech because there is no evidence that any

---

[18]A municipality is also liable for constitutional violations under § 1983 where the violation resulted from a municipal policy or custom, *Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Educ.*, 926 F.2d 505, 515 (6th Cir. 1991) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 128 (1988)); *Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658, 690 (1978), although Williams does not argue that this was the case here.

member of BOMA knew about Williams' involvement in the ouster suit or his complaints to the

police, or that any member of BOMA based his or her decision on Williams' protected speech.

Although the members of BOMA testified that they were unaware of Williams' protected

speech, there is sufficient contrary evidence to create, at the very least, a genuine issue of fact as

to what exactly the members of BOMA knew at the time of the hearing. First, Williams'

participation in the ouster suit against Randolph was a matter of public record. Also, prior to the

January Hearing, the City provided each member of BOMA with a packet of information that

included, among other documents, a copy of Randolph's October 9, 2007 email, in which she

first made allegations about Williams' conduct and stated that she was doing so because she

would "no longer [tolerate]" Williams' "attempt to make [her] life miserable," and a copy of the

transcript of the November Hearing, at which Johnson concluded that Randolph "was retaliating

because she was mad at [Williams]." Further, given the fact that Randolph remained a member

of BOMA through November 14, 2007, it seems highly unlikely that Randolph's colleagues on

BOMA would have been completely unaware of the circumstances surrounding her ouster,

including Williams' involvement.[19]

The court also finds *Meyers v. City of Cincinnati*, 14 F.3d 1115 (6th Cir. 1993),

instructive. In that case, the Sixth Circuit Court of Appeals held that a municipality was liable

under § 1983 where the plaintiff, who had been forced to retire as a result of protected speech,

appealed to the city's Civil Service Commission, which found that the plaintiff had "voluntarily"

---

[19]The City argues that a number of individuals who were members of BOMA in January 2008 had joined the board in November 2007, and that their tenures only briefly overlapped with that of Randolph. This fact does not, however, defeat the reasonable inference that BOMA members would have been aware of the circumstances surrounding Randolph's very recent ouster from her position.

retired and did not address the plaintiff's allegations. *Id.* at 1118. The court found that the commission could not escape liability "by simply delegating decisionmaking authority to a subordinate official and thereafter studiously refusing to review [the subordinate official's] unconstitutional action on the merits." *Id.* Here, as in *Meyers*, BOMA delegated decision-making authority to Johnson, a fact that is clearly demonstrated by Johnson's authoritative statements, in his December 12, 2007 letter, that Williams was terminated "effective immediately" and that Williams could "appeal" that decision. At the January Hearing, BOMA simply ratified that decision without making any inquiry into the decision or Williams' objections to either the decision or the process that preceded it.[20] Although the City vainly argues that BOMA was informed, to the extent that each member of BOMA reviewed a packet of materials prepared by the City prior to making its decision, there is evidence that the packet contained false and misleading information and, in any case, the packet did not reflect Williams' side of the story. Moreover, as the hearing was cut off and a vote held almost immediately after it commenced, it is evident that BOMA did not consider Johnson's determination in any meaningful way at the hearing, let alone provide Williams with an opportunity to present his case. BOMA, like the commission in *Meyers*, studiously refused to consider Johnson's decision, despite evidence that an unconstitutional motive underlay the decision and, instead, simply

---

[20]The City argues that, in *Meyers*, unlike the case here, there was no question as to whether the Civil Service Commission had knowledge of the subordinate official's unconstitutional motive and relies on *Hull* for the proposition that a final decision-maker cannot be liable for "rubber-stamping" a decision if it does not have knowledge of the protected activity. However, as the court has already concluded, there does exist a question of fact here as to precisely what the members of BOMA knew about the reasons underlying Williams' termination. Moreover, unlike the plaintiffs in *Meyers* and here, the plaintiff in *Hull* was afforded an opportunity to address the final decision-maker and simply failed to raise her constitutional objections at that time. *Hull*, 926 F.2d at 516.

ratified that decision.  As BOMA was the final decision-maker and as there is a genuine issue of fact as to whether BOMA knew of the unconstitutional motive underlying the decision of its delegate, Johnson, BOMA is not protected from liability under § 1983.

Therefore, the City's motion for summary judgment with respect to Williams' First Amendment claim will be denied.

## CONCLUSION

For the reasons discussed herein, the Motion for Summary Judgment filed by the defendant City of Franklin, Tennessee will be granted in part and denied in part.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge